UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NAIM QASEMI,

                              Petitioner,                      Case # 25-CV-6020-FPG

v.

                                                                       DECISION & ORDER

MERRICK b. GARLAND, et al.,

                              Respondents.
_____

## INTRODUCTION

      This case concerns an incident that occurred at the Abu Dhabi airport in October 2024. In connection with his removal from the United States, Petitioner Naim Qasemi, a native and citizen of Afghanistan, flew to the airport on his way to Afghanistan. He alleges that, once there, Emirati officials barred him from taking his flight to Afghanistan, thus preventing him from completing the final step in his removal process. Immigration authorities dispute Petitioner's narrative and counter that Petitioner caused a scene at the airport that led to the pilot's refusal to permit him entry on his flight. Petitioner was returned to the United States in immigration custody.

      By way of a habeas corpus petition under 28 U.S.C. § 2241, Petitioner now challenges his continued detention at the Buffalo Federal Detention Facility. Respondents oppose the petition. For the reasons that follow, the petition is DENIED.

## BACKGROUND

      It is undisputed that Petitioner, a noncitizen who has been in the United States since 1989, has a final order of removal. *See* ECF No. 1 at 2; ECF No. 10-1 at 2. In advance of his removal, Petitioner was taken into immigration custody on May 1, 2024. *See* ECF No. 10-1 at 4. In October 2024, immigration authorities attempted Petitioner's removal to Afghanistan. The parties offer

starkly different versions of events. For now, the Court will relay only Respondents' version of events. Timothy D. Jordan, an ICE Supervisory Detention and Deportation Officer, states the following:

> On October 21, 2024, at approximately 12:00 P.M. my partner—Eric Fiegel—and I arrived at the Buffalo Federal Detention Facility in Batavia, New York. We picked up [Petitioner] in order to execute his removal order. My mission was to escort [Petitioner] to another country, where I would then witness him board a flight to Afghanistan, completing his removal. . . . . At approximately 8:00 P.M. local time, on October 22, 2024, we landed in the destination airport [i.e., Abu Dhabi Airport]. I asked for directions to the gate for [Petitioner's] flight to Afghanistan, at which time [Petitioner] began yelling [to] airport personnel that they could not issue him a ticket for his flight to Afghanistan. My partner was able to settle [Petitioner] down, and the airport personnel directed me to the correct gate. There were several hours between the time we landed and the time of [Petitioner's] departing flight. During this time, [Petitioner] began to get worked up, and advised that he would not willingly board his flight to Afghanistan. . . . While at the ticketing area for [Petitioner's] flight, he again began yelling to airport personnel that they could not issue him a ticket for his flight to Afghanistan, and that ICE made up a fake document to get him removed. . . . . [Petitioner] also stated that if he got on the plane, he would kill himself and injure others, and [] the plane would not take off. . . . [Petitioner] began punching and kicking in the air and smashing a water bottle in his hands. He repeatedly told me that he was not getting on the plane and that we would have to kill him to get him on board.

ECF No. 10-3 at 2-3. Although Petitioner was able to calm down through the intervention of airport security, the flight's captain refused to allow him to board the plane after learning of Petitioner's behavior. *Id.* at 3. Petitioner was returned to the United States and is in immigration custody at the Buffalo Federal Detention Facility.

On January 8, 2025, Petitioner, then acting *pro se*, filed the present action. ECF No. 1. He alleges that, because there is "no significant likelihood that [he] will be removed in the reasonably foreseeable future," his continued detention in immigration custody is unlawful. *Id.* at 12. He requests release from custody. *Id.* at 13. Respondents oppose the petition, ECF No. 10, and Petitioner, now counseled, has filed a reply brief, ECF No. 13.

Petitioner has been in immigration custody for over eleven months.

## DISCUSSION

The parties agree on the relevant legal framework to be applied in assessing Petitioner's claim. Under 8 U.S.C. § 1231(a)(1)(A), "aliens ordered removed shall be removed by the Attorney General within [a] 90-day 'removal period.'" *Turkmen v. Ashcroft*, 589 F.3d 542, 547 (2d Cir. 2009). "The government is required to detain an alien ordered removed until removal is effected, at least for the removal period." *Id.* (citing 8 U.S.C. § 1231(a)(2)). If removal is not effectuated within the removal period, "the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." 8 U.S.C. § 1231(a)(3).

In addition, there is a "special statute [that] authorizes further detention if the Government fails to remove the alien" during the removal period. *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001). Specifically, 8 U.S.C. § 1231(a)(6) gives the government the discretion to detain certain categories of aliens:

> An alien ordered removed [1] who is inadmissible . . . [2] [or] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision . . . .

*Id.* (quoting 8 U.S.C. § 1231(a)(6)). By its plain language, the statute does not appear to impose any limitation on the length of an alien's detention. But in *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Supreme Court interpreted § 1231(a)(6) narrowly to avoid the possible constitutional problems with indefinite detention. It read the statute to impose certain implicit limitations on the government's authority to detain aliens falling into those categories. The court held that an alien could be detained "until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701. This limitation is linked to the statute's "basic purpose," which is to "assur[e] the alien's presence at the moment of removal." *Id.* at 699.

3

The *Zadvydas* court also provided a framework under which habeas courts are to review claims challenging continued detention under § 1231(a)(6). The ultimate question for the habeas court is "whether the detention in question exceeds a period reasonably necessary to secure removal." *Id.* The presumptively reasonable period of detention is six months. *Id.* at 701. Once that period has passed, an alien bringing a claim bears the initial burden of providing "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* If the alien makes such a showing, "the [g]overnment must respond with evidence sufficient to rebut that showing." *Id.*

In analyzing the likelihood of removal, courts consider a variety of factors, including the existence of a repatriation agreement with the target country, the target country's prior record of accepting removed aliens, and specific assurances from the target country regarding its willingness to accept an alien. *Callender v. Shanahan*, 281 F. Supp. 3d 428, 436-37 (S.D.N.Y. 2017); *see also Nma v. Ridge*, 286 F. Supp. 2d 469, 475 (E.D. Pa. 2003). Due deference is owed to the government's views on these matters as well as its estimation of the likelihood of removal. *See Zadvydas*, 533 U.S. at 700 (stating that review "must take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive . . . efforts to enforce this complex statute, and the Nation's need to 'speak with one voice' in immigration matters").

What constitutes the "reasonably foreseeable future" will depend on the length of detention. That is, "as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Zadvydas*, 533 U.S. at 701. In effect, the parties' respective burdens shift as the length of detention increases. *See, e.g., Alexander v. Attorney General U.S.*, 495 F. App'x 274, 276-77 (3d Cir. 2012) ("*Zadvydas* . . .

4

suggests that an inversely proportional relationship is at play: the longer an alien is detained, the less he must put forward to obtain relief."); *D'Alessandro v. Mukasey*, 628 F. Supp. 2d 368, 406 (W.D.N.Y. 2009); *Lawrikow v. Kollus*, No. CV-08-1403, 2009 WL 2905549, at *12 (D. Ariz. July 27, 2009); *Shefqet v. Ashcroft*, No. 02 C 7737, 2003 WL 1964290, at *4 (N.D. Ill. Apr. 28, 2003). Thus, as time passes, the mere existence of possible avenues for removal becomes insufficient to justify further detention; some evidence of progress is required. *See Elashi v. Sabol*, 714 F. Supp. 2d 502, 506 (M.D. Pa. 2010); *Lawrikow*, 2009 WL 2905549, at *13; *Hajbeh v. Loiselle*, 490 F. Supp. 2d 689, 693 (E.D. Va. 2007); *Shefqet*, 2003 WL 1964290, at *5. *But see Gathiru v. Banieke*, No. 15-CV-4247, 2016 WL 8671833, at *6 (D. Minn. Sept. 9, 2016) (noting that the mere "lack of visible progress" or the government's inability to provide a concrete timeframe for removal does not necessarily establish that removal is unlikely in the reasonably foreseeable future).

Petitioner's claim that his removal in the reasonably foreseeable future is unlikely rests on two allegations: first, that immigration authorities have historically had difficulty obtaining the necessary travel documents for Petitioner's removal; and immigration authorities do not presently have the requisite documentation to effectuate removal. *See* ECF No. 13 at 3-7. Assuming *arguendo* that Petitioner can meet the initial *Zadvydas* burden, the Court concludes that Respondents have sufficiently demonstrated that Petitioner's removal in the reasonably foreseeable future is likely.

To begin, the Court does not find salient Petitioner's reliance on immigration authorities' historical difficulties in effecting his removal. The record does disclose that such difficulties may have existed in the past. *See* ECF No. 13 at 3. Yet any favorable inference that might be drawn from that evidence is undercut by the fact that immigration authorities were able to obtain travel documents to effect Petitioner's removal in October 2024 and could have removed him, but for his

5

noncooperation at the Abu Dhabi airport.[1]  A noncitizen who is uncooperative in his removal cannot "convincingly argue that there is no significant likelihood of removal."  *Singh v. U.S. Att'y Gen.*, 945 F.3d 1310, 1314 (11th Cir. 2019); *see also Pelich v. I.N.S.*, 329 F.3d 1057, 1061 (9th Cir. 2003) (stating that a "non-cooperative detainee . . . cannot legitimately object to his continued detention when that very detention is caused by his own conduct").

Respondents present a plausible, reasonably straightforward version of events.  Petitioner has been in the United States for over thirty-five years since he first arrived in New York as a thirteen-year old refugee.  *See* ECF No. 10-2 at 7.  He considers "America [his] home."  ECF No. 1 at 16.  He has a son who is a U.S. citizen and "who depends on [Petitioner] and his mother."  *Id.* at 15.  Petitioner is gay and Christian.  *Id.* at 16.  He has heart and spine conditions that will require special treatment.  ECF No. 9 at 1.  Petitioner fears how he could be treated in Afghanistan.  *See* ECF No. 1 at 16.  And Petitioner actively contests the validity of his removal order.  *See* ECF No. 6 at 59 (alleging that he has derivative citizenship because he was adopted by a U.S. citizen; that he has a valid asylum claim; and that he was unlawfully ordered removed without notice of the hearing); ECF No. 1 at 2-3 (noting that, in August 2024, he moved to reopen his immigration case and stay his removal).  All of these facts give Petitioner an obvious (and perfectly understandable) motive to thwart removal efforts.  *See, e.g.*, ECF No. 6 at 3 (stating that if he is separated from his son "it will be like I cannot breathe"); *id.* (stating that he suffers from "anxiety, depression, and [] PTSD when [he] think[s] about returning to Afghanistan"); *id.* at 69 (stating that he will be "beheaded or stoned to death" if removed).

---

[1] While the events that took place at the Abu Dhabi airport are disputed, the Court has before it a robust evidentiary record on which to make the necessary factual determinations.  A hearing is therefore unwarranted.  *Cf. Crisci v. United States*, 108 F. App'x 25, 27 (2d Cir. 2004) (summary order) (in the Section 2255 context, noting that a court may choose "a middle road" by resolving factual questions on an expanded documentary record, as opposed to a full-blown evidentiary hearing).

Respondents present evidence that, consistent with that motive, Petitioner yelled profanity and racist remarks, accused deportation officers of falsifying documents "to get him removed," threatened harm to others if he got on the plane, and otherwise made a scene in order to avoid boarding his flight to Afghanistan. ECF No. 10-3 at 2-3. The flight's captain reasonably responded that he would not permit Petitioner to "board the plane in the interests of the safety of other passengers and the security of the aircraft." *Id.* at 3. Once the flight to Afghanistan left, and Petitioner had succeeded in his efforts, Petitioner "calmed back down." *Id.* at 4. Petitioner has now been returned to the United States, where he is currently agitating for his release from custody. *See* ECF No. 9 at 5, 7. None of what Respondents describes is, on its face, implausible or inconsistent.

By contrast, Petitioner's narrative involves several shifting, unlikely, and/or inconsistent elements, which, taken together, wholly undermine his credibility.

At least originally, Petitioner's overarching theory was that immigration authorities were involved in a "conspiracy" against him to effect his removal. ECF No. 9 at 4. The motivation for this conspiracy is not clear, but Petitioner initially alleged that immigration authorities were effectuating it through various unlawful means. In his *pro se* filings, Petitioner alleged that authorities manipulated and/or falsified a 1993 immigration case involving Petitioner's brother in an attempt to obtain a travel document for Petition. *See* ECF No. 9 at 2-4. Petitioner alleged that immigration authorities bribed an airline to violate FAA rules so that he could be removed without the proper travel documents. ECF No. 1 at 5. And Petitioner alleged that immigration authorities falsified travel documents in connection with his attempted removal in October 2024. *See* ECF No. 6 at 1. Yet in his most recent, counseled filing, Petitioner omits any mention of these broader conspiracy allegations, and he has failed to provide substantive evidentiary support for them.

The progression of events has also morphed over the course of this action. In his original *pro se* petition, Petitioner alleges that he was stopped by Emirati "*law enforcement*" upon "landing" in the country. ECF No. 1 at 4 (emphasis added). He alleges that, at that time, he was refused entry into the United Arab Emirates because he did not have an "official travel document to enter Afghanistan." *Id.* One Emirati "law enforcement officer" informed Petitioner that his travel documents were "insufficient and fraudulent," and the law enforcement officers further explained to Petitioner that the tazkira that ICE officers possessed was from the prior communist regime and would cause the Taliban to kill him if he were to proffer it in Afghanistan. *Id.* Petitioner was therefore compelled to return to the United States.

In a *pro se* letter dated February 3, 2025, Petitioner changed several of the details in his account. He stated that Emirati "*immigration* officials," not law enforcement, were the ones who reviewed his travel documents and "rejected [his] boarding pass." ECF No. 6 at 2 (emphasis added). They purportedly told Petitioner he needed "an official travel document issued by an Afghanistan Consulate" to travel to Afghanistan. *Id.* In a document attached to the letter, Petitioner also claimed that Emirati "customs" officials prevented him from getting on the flight when it was "ready to board"—not upon landing. *Id.* at 49.

After Respondents submitted Officer Jordan's declaration, Petitioner filed a new, counseled declaration. ECF No. 13-1. For the first time in his filings, Petitioner admits that he did indeed get "emotionally upset" at the airport. *Id.* at 4. This was because he saw the purportedly invalid tazkira and knew from his own experience that its use would "identify [him] as someone in opposition to [the current Taliban regime]." *Id.* at 3. Petitioner believed that the travel documents were invalid and therefore requested to speak to an Emirati "immigration official." *Id.* at 4. He also admits that when he spoke with an Emirati customs official on the phone he alleged

8

that the travel document was invalid, refused to be "forced" on the plane, and stated he would "rather die here than at the hands of the Taliban." *Id.* This narrative departs in several respects from prior filings, insofar as Petitioner now concedes that he got upset at the airport and alluded to death; that he instigated the dispute over the validity of the travel documents and the tazkira; that he initiated the encounter with Emirati officials; and that he refused to board.

Of course, Petitioner also claims that Emirati officials agreed with his position and refused to permit him to board his flight, *see id.* at 4-5, and on this basis he disputes that he was uncooperative. *See* ECF No. 13 at 4, 8-10. But not only does Petitioner's newest narrative lack credibility given the ways in which it departs from his prior filings,[2] it lacks internal plausibility on its own terms. In Petitioner's telling, he was permitted to enter Abu Dhabi airport and pass through its initial entry requirements *with invalid travel documents*. There is nothing to suggest that, having been permitted to enter the airport, Petitioner would have been subjected to any further inquest into his travel documents by Emirati officials prior to boarding his flight. Yet Petitioner claims that Emirati officials took it upon themselves to perform an *ad hoc* re-assessment of his travel documents in the middle of the airport simply because he raised an objection to them. Absent further corroboration, the Court does not find it plausible that airport customs or immigration officials would have acted in that manner.[3]

For these reasons, the Court finds, consistent with Officer Jordan's narrative, that Petitioner was uncooperative in his removal based on his refusal to board his flight to Afghanistan in October

---

[2] In his counseled declaration, Petitioner states nebulously that "[a]ny papers" he previously filed were "prepared by other people" because he cannot "read or write" in English. ECF No. 13-1 at 1. This may be Petitioner's attempt to disavow some of the inconsistent details among his prior filings, but, absent a clearer indication of what exact details he wishes to clarify or withdraw, the Court does not find this vague excuse persuasive.

[3] In this respect, it is revealing that in his *pro se* filings, Petitioner suggested that Emirati officials stopped him either upon landing, *see* ECF No. 1 at 4, or at boarding, *see* ECF No. 6 at 49—either of which is more plausible than Petitioner's newest narrative.

2024. The Court further finds that, because Petitioner was able to obtain travel documents and, based on the available evidence, would have been able to fly to Afghanistan absent his own conduct, any prior difficulties in obtaining travel documents do not suggest that Petitioner's removal in the reasonably foreseeable future is unlikely. *See Brown v. Barr*, No. 18-CV-6841, 2019 WL 4303352, at *3 (W.D.N.Y. Sept. 11, 2019). To the contrary, Respondents' success in obtaining the necessary documents and (nearly) effectuating Petitioner's removal supports the conclusion that Petitioner's removal in the reasonably foreseeable future is likely.

Even so, Respondents concede that Petitioner can no longer be removed. In January 2025, Afghanistan "changed the requirements for entry into the country—now requiring a physical passport book and not just copies of one—and ICE does not presently possess the documents required to remove [Petitioner]." ECF No. 10-1 at 5; ECF No. 11 at 4. Immigration authorities are now negotiating with the Afghan government to "allow those without passports to travel to Afghanistan." ECF No. 11 at 4. Those negotiations remain ongoing. *See id.* Petitioner argues that this undisputed obstacle renders his removal unlikely in the reasonably foreseeable future. *See* ECF No. 13 at 6-7.

At this juncture, the Court cannot conclude that Petitioner's removal in the reasonably foreseeable future is unlikely. To be sure, ordinarily, the length of Petitioner's detention would begin to weigh in his favor. *See, e.g.*, *Hassoun v. Sessions*, No. 18-CV-586, 2019 WL 78984, at *5 (W.D.N.Y. Jan. 2, 2019) ("[T]he government's burden becomes more onerous the longer an alien is detained, because it must show that removal will be effectuated sooner in the future."). But as stated, it would be inappropriate to rely too heavily on that fact given that Respondents could have removed Petitioner within the presumptively reasonable six-month period but for his noncooperation. *Cf. Abimbola v. Ridge*, 181 F. App'x 97, 99 (2d Cir. 2006) (summary order) ("[A]

10

self-inflicted wound should not establish grounds for [a noncitizen's] *Zadvydas* claim."). And while it is certainly true that, even now, Respondents are under a duty to make reasonable efforts to effect Petitioner's removal, notwithstanding his noncooperation in October 2024, *see Gul v. Rozos*, 163 F. App'x 317, 319 (5th Cir. 2006) (summary order) (noting that a noncitizen's one-time noncooperation with removal did not relieve the government of its burden to proffer an explanation for his continued detention one year later), Petitioner's noncooperation has resulted in his continued detention under new diplomatic circumstances. Respondents are entitled to a reasonable opportunity to navigate these new "diplomatic hurdles." *Hassoun*, 2019 WL 78984, at *6. Given the early stages of the negotiations, and in light of the greater immigration-related expertise of the Executive Branch, the Court is willing to credit Respondents' position that its efforts with the Ministry of Foreign Affairs will bear fruit. *See* ECF No. 11 at 4; *accord Chen v. Banieke*, No. 15-CV-2188, 2015 WL 4919889, at *4 (D. Minn. Aug. 11, 2015) (noting that relief under *Zadvydas* is only appropriate where "removal seems a remote possibility at best," not where "removal is temporarily impeded by bureaucratic delays, setbacks, and ongoing negotiations with foreign governments"). Should Petitioner continue to remain in detention for an extensive period of time without "visible progress" in those negotiations, he is free to renew his petition. *Gathiru*, 2016 WL 8671833, at *6. At present, however, the Court is satisfied that Respondents have made the necessary showing that there is a significant likelihood of removal in the reasonably foreseeable future. Therefore, Petitioner's petition must be denied, without prejudice to renewal in the future.

## CONCLUSION

For the reasons stated herein, the petition (ECF No. 1) is DENIED, without prejudice to renewal in the future. The Clerk of Court shall enter judgment and close the case.

IT IS SO ORDERED.

Dated: April 9, 2025
       Rochester, New York

                                        HON. FRANK P. GERACI, JR.
                                        United States District Judge
                                        Western District of New York